UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
C.D. KOBSONS, INC.,                          :        Civil Action No.: 07 CV 11034 (SAS)
                                             :
                      Plaintiff,             :        DECLARATION IN
        -against-                            :        SUPPORT OF
                                             :        EDWARD S. BENSON
UNITED NATIONAL SPECIALTY                    :
INSURANCE COMPANY,                           :
                                             :
                      Defendant.             :
--------------------------------------------------------x

Pursuant to U.S.C. §1746, I, Edward S. Benson, declare under penalties of perjury as

follows:

1. I am a member of the Bar of the State of New York and of the bar of this Court. I am

a partner in the law firm of Nicoletti Gonson Spinner & Owen LLP, attorneys for defendant

UNITED NATIONAL SPECIALTY INSURANCE COMPANY ("UNSIC").

2. This declaration is made in support of the motion of UNSIC pursuant to Federal Rule

of Civil Procedure 56 for an order awarding summary judgment.

3. Attached hereto as Exhibit A is a true and correct copy of an extract from the

deposition testimony of Cesar Arrascue taken on March 18, 2008.

4. Attached hereto as Exhibit B is a true and correct copy of an extract from the

deposition testimony of Doungrat "Diane" Eamtrakul taken on April 23, 2008.

5. Attached hereto as Exhibit C is a true and correct copy of an extract from the

deposition testimony of Naweed A. Chaudhri taken on March 26, 2008.

6. Attached hereto as Exhibit D is a true and correct extract from a certified copy of

UNSIC's policy number M5200158. A full certified copy of UNSIC's policy number M5200158

is not included as it would exceed the page limitation on exhibits, but can be provided if the Court desires.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 19, 2008

_____
Edward S. Benson

# EXHIBIT A

6

```
 1                       C. Arrascue
 2   no time in response to any of my questions
 3   should you guess.
 4             Are all those instructions clear?
 5        A.    They are.
 6        Q.    Mr. Arrascue, can you tell us your
 7   date of birth?
 8        A.    November 13, '51, 1951.
 9        Q.    And what is the highest level of
10   education you reached?
11        A.    High school and two years of higher
12   education, it is called.  It's is not exactly
13   college, but it is a technical school.
14        Q.    And do you have any professional
15   licenses?
16        A.    Yes.  To sell insurance.  You want
17   the licenses or just --
18        Q.    Well, what licenses do you have?
19        A.    Life, property and casualty, health,
20   investments, securities.
21        Q.    And when did you first obtain a
22   property and casualty license?
23        A.    19 -- approximate, okay?
24        Q.    Approximate.
25        A.    1981, 1980, around there.
```

17

1                          C. Arrascue

2          A.      Correct.

3          Q.      And what type or types of insurance

4     have you obtained for C.D. Kobsons?

5          A.      Always property and casualty.

6          Q.      Now, in 2004 did you seek coverage

7     on behalf of C.D. Kobsons?

8          A.      Yes, I did.

9          Q.      And did you seek coverage through a

10    company called Morstan?

11         A.      Yes, through the agent, right.

12         Q.      Morstan is a general agent?

13         A.      General agent.

14         Q.      And did you prepare an application

15    to be submitted to Morstan?

16         A.      Yes.

17              MR. BENSON:  Can you mark that as

18         Arrascue 2, and a copy for counsel.

19              (Arrascue Exhibit 2, Acord 125

20         Commercial Insurance Application, Bates

21         Numbered UNI 00170 through 177, marked for

22         identification.)

23         Q.      Now, Mr. Arrascue, I am going to

24    show you what we have marked as Arrascue

25    Exhibit 2 today.  It is a multipage document and

29

C. Arrascue

1

2      Q.    I understand.  You mentioned that on

3  occasions you would fill in the title and the

4  date.

5      A.    Correct.

6      Q.    Do you ever sign this document?

7      A.    No.

8      Q.    In all cases would you insure that

9  the insured signs the Anti-Arson Application?

10      A.    Always mail it to the client.

11      Q.    Mr. Arrascue, do you recollect

12  speaking with anyone at Morstan regarding the

13  2005 renewal?

14      A.    Only when, to request to be bound,

15  maybe sometimes, because most of these renewals

16  are automatic.  They send the forms, get it

17  back, if they get a payment.  But sometimes we

18  have to request to be bound.

19      Q.    As you sit here today do you

20  remember speaking to them in 2005 about renewal?

21      A.    I can't, I cannot actually say, I

22  don't know.

23      Q.    Mr. Arrascue, do you have a

24  recollection of whether the same procedure was

25  followed to renew the policy in 2006?

43

C. Arrascue

1

2      A.    "No."

3      Q.    Did you ever tell anyone at Morstan

4  that answer was incorrect?

5      A.    No.

6      Q.    Did you ever receive any information

7  that that answer was incorrect?

8      A.    You are referring at any time?

9      Q.    At any time.

10     A.    Well, last year.

11     Q.    Apart from anything you received

12 after the renewal in 2007, before that did you

13 receive anything that indicated that any of

14 those answers on any of those applications were

15 incorrect?

16     A.    Prior to renewal you mean?

17     Q.    In 2007.

18     A.    No.

19     Q.    If you had been told that there were

20 outstanding violations against the building that

21 was being insured, is that something that you

22 would have advised Morstan or United?

23     A.    Of course.

24     Q.    And why would you have told them

25 that?

44

C. Arrascue

1

2          A.    It is part of the underwriting

3     procedure.  They have to know that in order to

4     assess the risk.

5          Q.    Is knowing whether violations have

6     been assessed against a property an important

7     piece of information for underwriting the risk?

8          A.    Yes, I would say so.

9          Q.    Is that based on your experience?

10          A.    Correct.

11          Q.    Was the policy renewed for

12     2007-2008?

13          A.    Yes, I believe so, yes.

14               MR. BENSON:  If we can mark that,

15          please.

16               (Arrascue Exhibit 9, certified copy

17          of policy issued by United National

18          Specialty Insurance Company to C.D.

19          Kobsons, Inc., Bates stamped UNI 00001

20          through to UNI 00077, marked for

21          identification.)

22          Q.    Mr. Arrascue, I am going to show you

23     what we have marked as Arrascue Exhibit 9.  It

24     is a multipage document beginning at UNI 00001

25     through to UNI 00077, and I will represent to

54

1                           C. Arrascue

2    Cambridge.  Those would be the ones that they

3    might use.

4           Q.     When you spoke to --

5           A.     Demetriou?

6           Q.     -- the underwriter, Heffner --

7           A.     Okay.

8           Q.     We will do them one at a time.

9           A.     Okay.

10          Q.     -- what was the underwriter's

11   response when you told them the situation at

12   C.D. Kobsons Company?

13          A.     That none of the companies that they

14   represent would write the risk.

15          Q.     And did they tell you anything more

16   as to why the companies wouldn't write it?

17          A.     Because of the structure, the safety

18   of the structure of the building.  And the

19   violations.

20          Q.     Now, with respect to Demetriou

21   Group, do you know whom they represent?

22          A.     Basically the same companies.  What

23   else?  Might have Rutgers also, maybe, Rutgers

24   Insurance Company.

25                 And there also was the same thing,

55

1                          C. Arrascue

2    they will not have anybody to write the risk.

3         Q.    Was it for the same reasons that

4    Heffner had told you?

5         A.    Same reasons.

6         Q.    With regard to the Sovereign Group,

7    what companies do they represent?

8         A.    Okay, Sovereign Group, usually they

9    deal with what is called the excess market, and

10   we use them when we can't find anybody on the

11   regular market to write a risk.  It is what is

12   called an unadmitted carrier, unadmitted

13   insurance carrier.  And they represent

14   Scottsdale, U.S. Underwriters, U.S. Liability,

15   and a few more.  And I was told the same thing.

16        Q.    Was that they were concerned about

17   the safety of the building?

18        A.    Yeah, the risk.

19        Q.    And they were concerned about the

20   existence of the violations?

21        A.    That's what it is, yes.

22        Q.    After speaking to these various

23   underwriters, did you make a determination that

24   the building was uninsurable?

25        A.    Well, I told that to Diana, yes.  I

58

1                       C. Arrascue

2          A.     Before that?

3          Q.     Before that.

4          A.     I assume it was.

5          Q.     If you had gone to the three

6    agencies that you mentioned, The Heffner Agency,

7    Demetriou Group, Sovereign Group, would you have

8    expected that they would be able to find

9    insurance for you if there was no emergency

10   declaration?

11         A.     Just as Morstan did, yes.

12         Q.     So from your experience, was the

13   issuance of the emergency declaration a

14   significant development?

15         A.     Absolutely.

16              MR. BENSON:  Would you mark that as

17         13, please.

18              (Arrascue Exhibit 13, Notice of

19         Violation and Hearing, Violation Number

20         34489984J, dated September 29, 2005,

21         marked for identification.)

22         Q.     Mr. Arrascue, I am going to show you

23   what we have marked as Arrascue Exhibit 13,

24   which is a single-page document headed "Notice

25   of Violation and Hearing."  It has a Violation

59

1                          C. Arrascue

2  Number of 34489984J, and it bears the date of

3  September 29, 2005.

4            My question to you is, have you ever

5  seen that document before?

6        A.    I don't think so.

7        Q.    Do you know what this document is?

8        A.    It says here Notice of Violation and

9  Hearing.

10       Q.    Mr. Arrascue, if you had been told

11 about the issuance of the violation that we have

12 marked as Arrascue 13, would that have affected

13 how you would have proceeded in this case?

14       A.    Yes, sure.

15       Q.    And how would it have affected how

16 you would have proceeded?

17       A.    First of all, I would have done the

18 same thing, I would send a copy of this with the

19 application to whoever might want to entertain

20 to take the risk.

21       Q.    Would it have affected the content

22 of the Anti-Arson Application?

23       A.    I believe so, yes.

24       Q.    Let me show you again Arrascue 5,

25 which was completed for the 2006 renewal.  Based

65

1                    C. Arrascue

2          Q.    And once again, the existence of

3   that violation, does that render the answer to

4   Question 4 on the 2006 application incorrect?

5          A.    Yes.

6          Q.    Mr. Arrascue, with respect to all of

7   the violations that we have just reviewed, which

8   I will show them to you once again, which were

9   marked Exhibit 13, 14, 15, 16 and 17, if those

10  violations were still in existence when the

11  renewal came into being in 2007, would the

12  answer on the Anti-Arson Application that we

13  marked as Arrascue 8 have been inaccurate as

14  well?

15         A.    Yes.

16         Q.    Mr. Arrascue, do you know if United

17  National Specialty would have renewed the policy

18  it issued to C.D. Kobsons if the Department of

19  Buildings had declared the building unsafe prior

20  to the renewal date?

21         A.    No, they would not renew it, no.

22         Q.    And why do you believe that?

23         A.    Because of the underwriting

24  guidelines.

25         Q.    And what about the underwriting

66

1                    C. Arrascue

2    guidelines?

3          A.    Well, one of the rules is, says that

4    the safety of the building is very important and

5    there should be no violations pending, something

6    to that effect.

7                MR. REICHARDT:   Can I have the last

8          question and answer read back, please.

9                (The record was read.)

10         Q.    Do you know if United Specialty had

11   any prohibition against insuring buildings that

12   had to undergo shoring?

13         A.    I don't know.   I'm not for sure.

14               MR. BENSON:   Would you mark this,

15         please.

16               (Arrascue Exhibit 18, proposed

17         affidavit, marked for identification.)

18         Q.    Mr. Arrascue, I am going to show you

19   what we have marked as Arrascue Exhibit 18

20   today.   It is a two-page document.   And if you

21   could tell me, do you know what this is?

22         A.    Oh, yes.   This is something that I

23   received from the office of the, the lawyers'

24   office from C.D. Kobsons, in which they asked me

25   to sign, an affidavit, I believe, yes.

C. Arrascue

1

2    change in the nature or extent of the risk,

3    occurring after issuance of last annual renewal

4    anniversary date of the policy, which causes the

5    risk of loss to be substantially and materially

6    increased beyond that contemplated at the time

7    the policy was issued or last renewed."

8        Q.    Mr. Arrascue, from your experience,

9    based upon the issuance of the emergency

10   declaration, do you consider that there was a

11   material change in the nature or extent of the

12   risk after that declaration was issued?

13       A.    Well, yes.  Yes.

14            MR. REICHARDT:  Could we take a

15        break for one second.

16            MR. BENSON:  Sure.

17            (Recess taken at 1:06 p.m. until

18        1:09 p.m.)

19            MR. BENSON:  Let me just note on the

20        record, subject to any follow-up I may

21        have, I have nothing further for you

22        Mr. Arrascue.  Thank you very much.

23            THE WITNESS:  Thank you.

24   EXAMINATION

25   BY MR. REICHARDT:

# EXHIBIT B

8

1                          D. Eamtrakul

2    responsibilities as president of C.D. Kobsons?

3              A.     I manage the property of

4    311 Tenth Avenue, known as 500 West 28th Street.

5              Q.     Who owns that building?

6              A.     C.D. Kobsons, Inc.

7              Q.     When did C.D. Kobsons purchase

8    that building?

9              A.     I believe it was in 1982.

10             Q.     What is the business of C.D.

11   Kobsons?

12             A.     Own and manage this property.

13             Q.     Does C.D. Kobsons own any other

14   properties apart from 311 Tenth Avenue?

15             A.     No.

16             Q.     Can you describe 311 Tenth Avenue?

17             A.     It's 25 by 100 feet property, and

18   there is an existing building, four story

19   walk-up, a brick building.  The downstairs and

20   the basement is about 25 by 55 feet.  And the

21   second floor to the fourth floor is about 25

22   by 45 feet on each floor.

23             Q.     Is the ground floor level of the

24   building devoted to any commercial space?

25             A.     Yes.

13

1                          D. Eamtrakul

2    it.  Ms. Eamtrakul, do you recognize any

3    handwriting on the first page of Arrascue

4    Exhibit 2?

5              A.      The signature.

6              Q.      Is one of those signatures your

7    signature?

8              A.      Yes, I believe so.

9              Q.      Which one is that?

10             A.      On the left side.

11             Q.      Does that refresh your

12   recollection as to whether you received this,

13   at least page one of this document, and signed

14   it?

15             A.      Possibly, yes, I think so.  It

16   was a while ago, I don't remember but --

17             Q.      Ms. Eamtrakul, do you recollect

18   seeing any of the pages that are in Arrascue

19   Exhibit 2 before today?

20             A.      What's the question again?

21             Q.      Whether you recollect seeing any

22   of the pages that are part of Arrascue 2?

23             A.      It looks familiar.

24             Q.      So do you recollect seeing any of

25   the pages?

1                        D. Eamtrakul

2    have many forms or things that need to be

3    filled.  A lot of it sometime I understand,

4    sometime I don't.

5                    MR. BRILL:  Can you repeat that

6            last line?

7                    (Record read.)

8            Q.    Ms. Eamtrakul, did you understand

9    that the form that's marked as Arrascue 5 had

10   to be signed by you in order to obtain

11   insurance?

12           A.    You just told me.  At the time, I

13   don't know.

14           Q.    Did you read the form Arrascue 5

15   before you signed it?

16                   MR. BRILL:  Then back in --

17           A.    Did I read it?  I'm not sure.

18           Q.    Have you ever read the anti-arson

19   application form NYFA-1 Part One?

20                   MR. BRILL:  Do you remember?

21           A.    Yes.

22           Q.    I'm sorry?

23           A.    Yes.

24           Q.    And when did you read it?

25           A.    What I remember, I think it's in

24

```
 1                         D. Eamtrakul
 2    2007 I read it.
 3            Q.    I'm sorry?
 4            A.    2007 I read it.
 5            Q.    And in 2007 you read it before
 6    you signed it?
 7            A.    Yes.
 8            Q.    Ms. Eamtrakul, let me show you
 9    what we had previously had marked as
10    Arrascue 8 and ask you whether you have seen
11    that document before?
12            A.    Yes.
13            Q.    Does your signature appear on
14    that document?
15            A.    Yes.
16            Q.    Is that above the line, Signature
17    of Proposed Insured?
18            A.    That's correct.
19            Q.    Do you recognize any of the other
20    handwriting on this document?
21            A.    I recognize the 1982.
22            Q.    Which is next to the purchase
23    information date?
24            A.    That's correct.  I recognize the
25    title, I wrote it down, President of C.D.
```

26

D. Eamtrakul

1

2      Q.    I show you the back of

3   Arrascue 8, do you recognize any of the

4   handwriting on that page?

5      A.    Yes.  They are my handwriting.

6      Q.    Can you tell me which portions of

7   this document is your handwriting?

8      A.    I believe all except the

9   typewriter print which I don't have, the typed

10   Diana Eamtrakul.  My handwriting was at the

11   bottom, Doungrat.  The address typed down

12   500 West 28th Street, that's not from my

13   office.  "Position, Owner, Interest

14   100 percent", that's not from my office.

15      Q.    I direct your attention to the

16   line that says, Code Violations, do you see

17   that?

18      A.    Yes.

19      Q.    Along that line next to the word

20   decision there appears to be an N/A, do you

21   see that?

22      A.    Yes.

23      Q.    Is that your handwriting?

24      A.    Yes.

25      Q.    Did you place that there?

1                    D. Eamtrakul

2              MR. BRILL:  Diane, you said

3         something about a fire.  Was there ever

4         a fire in the building?

5              THE WITNESS:  Yes.

6              MR. BRILL:  Thank you.

7              MR. BENSON:  Counsel, I've been

8         indulgent.  You know you're not

9         supposed to do what you're doing,

10        asking questions out of turn, making

11        comments.  So can we cut that out,

12        please?

13        Q.    Question four to put that into

14   the record, "Are there any outstanding

15   recorded violations of fire safety, health,

16   building or construction codes at this

17   location?"  Do you see that question?

18        A.    Yes.

19        Q.    And do you see that the check

20   mark appears in the no box?

21        A.    Yes.

22        Q.    Was that true on July 7th, 2007?

23        A.    Well, it depends.  It said

24   outstanding recorded violations.  I remember

25   that I had a discussions with Mr. Cesar about

29

1                          D. Eamtrakul

2     recorded.  I mean, you know, I don't

3     understand if it's recorded like a deed, you

4     have to record it with the County Clerk.  So

5     that's how I remember.

6          Q.    Let me clarify this.  You say you

7     had a discussion with Mr. Cesar about

8     answering this question number 4?

9          A.    Not particular answering the

10    question.  My question was just directly to

11    him that, you know, what is a recorded

12    violation?

13         Q.    When did you have that discussion

14    with him?

15         A.    I believe after he gave me these

16    in mailing or faxing these applications.

17         Q.    Now I showed you the anti-arson

18    applications for the prior years, each of

19    which has the same question that we just have

20    been reviewing, number 4 and the same answer.

21         A.    Yes.

22         Q.    Do you recollect at what time you

23    had the discussion with Mr. Cesar with respect

24    to what is a recorded violation?

25         A.    I believe it's in 2007.

30

```
1                     D. Eamtrakul

2         Q.    What did Mr. Cesar say to you?

3         A.    I don't remember.

4         Q.    Were there violations on the

5    building in 2007?

6         A.    Were there violations?  Yes.

7         Q.    Do you recollect how many

8    violations there were?

9         A.    I don't know.

10              (Kobsons Exhibit 1, Closing of

11              Columbia Capital, dated May 9, 2007,

12              was marked for identification, as of

13              this date.)

14        Q.    Ms. Eamtrakul, I will show you

15   what we have marked as Kobsons Exhibit

16   Number 1 today.  It's a multiple

17   page document, 28 pages in all.  I ask you to

18   look at it and tell me if you have seen this

19   as a whole before?

20        A.    Yes, I have seen it before, I

21   think.

22        Q.    What are the documents that make

23   up Kobsons 1, in general?

24        A.    The documents during the closing

25   of the refinance with Columbia Capital.
```

45

D. Eamtrakul

1   Kobsons 1, do you know what this document is?

2   A.     It looks familiar.   It's a

3   Building Registration Summary Report, open

4   violations.

5   Q.     Ms. Eamtrakul, do you know if

6   this document, which is two pages and as you

7   described it as Building Registration Summary

8   Report, represents a list of HPD violations?

9   A.     I believe so.

10  Q.     In May of 2007 were there

11  outstanding HPD violations on the building?

12  A.     In 2007?   Yes, there were.

13  Q.     Do you recognize the list of

14  violations in here, the two pages of this

15  report?

16  A.     Do I recognize it, is that what

17  you're saying.

18  Q.     Yes, the violations.

19  A.     Yes, I think so.

20  Q.     And do you know if there are

21  currently any outstanding HPD violations on

22  the building?

23  A.     Yes, there are.

24  Q.     Have any of the violations that

55

1                          D. Eamtrakul

2    familiar, but I don't remember if I have seen

3    this page, this particular page.

4            Q.    Ms. Eamtrakul, do you recollect

5    attending a hearing with respect to this

6    violation?

7            A.    I have attended a lot of

8    violation meetings in 2006, possibly 2005 or

9    2007. I don't recognize particularly this one

10   or not.

11           Q.    I take you back to the first

12   page. Do you recollect a violation penalty of

13   $2,000 being assessed with regard to violation

14   34508672 L?

15           A.    I recognize the violation number,

16   and I recognize $2,000 penalty, but I'm not so

17   sure it's matching the same or not.

18                 (Kobsons Exhibit 4, New York City

19             Environmental Control Board document,

20             was marked for identification, as of

21             this date.)

22           Q.    Ms. Eamtrakul, I am going to show

23   you what we've marked as Kobsons Exhibit 4,

24   it's a four page document. Again, I just ask

25   if you have seen any part of it before today?

```
 1                  D. Eamtrakul
 2   documents that accompanied the note from
 3   Mr. Arrascue which we've marked as Kobsons 8?
 4        A.    Yes, I'm sorry, what's the
 5   question?
 6        Q.    Whether the documents marked
 7   Arrascue 7 and 8 accompanied the note from
 8   Mr. Arrascue that we marked as Kobsons 8
 9   today?
10        A.    To my recollection, I think this
11   is one of them.  I don't think that's the
12   other one.
13             MR. BRILL:  Let the record
14        reflect that the witness pointed to
15        exhibit -- is it 8?
16             MR. BENSON:  Arrascue 8.
17             THE WITNESS:  Yes.
18        Q.    Now with respect to Arrascue 7,
19   on the second page of the back side of that
20   document, do you recognize any handwriting
21   there?
22        A.    Yes, I recognize my signature,
23   and the title, that's my handwriting, and the
24   date.
25        Q.    Do you recollect reviewing and
```

66

D. Eamtrakul

1

2   signing Arrascue 7?

3         A.    I remember I reviewed it, yeah,

4   and signed it.

5         Q.    Now on the first page of Arrascue

6   7, you see near the bottom there's the word

7   None that's been written, did you write that?

8         A.    No.

9         Q.    Was that in place when you

10  received this document?

11        A.    I would think so, I'm not sure.

12        Q.    Did you put any of the check

13  marks that appear on either side of

14  Arrascue 7?

15        A.    I'm not sure.  I don't think so,

16  but I'm not sure.

17        Q.    Do you remember having any

18  discussions with Mr. Arrascue concerning the

19  preparation of Arrascue 7?

20        A.    No.  Excuse me, can I see that?

21        Q.    Sure.

22        A.    Thank you.

23        Q.    Ms. Eamtrakul, did there come a

24  time when you received an emergency

25  declaration concerning the building in or

79

D. Eamtrakul

1

2       A.      Yes, I did.

3       Q.      Did you agree with Mr. Dubinsky's

4   conclusions?

5       A.      Yes, I agree with him.

6               MR. BRILL:  To the extent, of

7           course, that she doesn't have technical

8           or professional expertise as an

9           engineer, but what she knows and sees

10          in the building.  Just to clarify the

11          record.

12              (Kobsons Exhibit 13, a report

13          from AEN Architects dated October 27,

14          2005, from Alex Nussbaumer, was marked

15          for identification, as of this date.)

16      Q.      Ms. Eamtrakul, let me show you

17  what we've marked as Kobsons Exhibit 13.  It's

18  a multi-page document, the first page of which

19  is on the letterhead of AEN Architects.  It

20  bears the date October 27th, 2005.  And is it

21  an October 27th 2005 Assessment Report?

22      A.      Yes.

23      Q.      Have you seen these documents

24  before?

25      A.      Yes, I have seen them before.

80

D. Eamtrakul

1

2      Q.      What are these documents?

3      A.      The front page is a letter from

4  Alex Nussbaumer to Ms. Osorio, Commissioner of

5  the DOB.  And the second page, on the last

6  page was his report assessment of the

7  property.

8      Q.      If I can take you to the page

9  that's headed Part Three Conclusion, do you

10  see that?

11     A.      Yes.

12     Q.      And where it says 3.1

13  Recommendations, do you see that?

14     A.      Yes.

15     Q.      At the time that you received

16  this, did you accept Mr. Nussbaumer's

17  recommendations?

18     A.      Yes, I accept it.

19     Q.      Did you ever advise Mr. Arrascue

20  at ARCO Insurance Agency of the content of

21  either Kobsons 13 or Kobsons 12?

22     A.      I'm not sure, I may.  I'm not

23  sure.

24     Q.      Did you ever contact Morstan

25  Insurance Agency and advise them of the

81

D. Eamtrakul

1

2    content of Kobsons 12 or Kobsons 13?

3            A.     I don't remember.

4            Q.     Did you ever contact United

5    National Specialty Insurance Company and

6    advise them of the contents of either

7    Kobsons 12 or Kobsons 13?

8            A.     When?

9            Q.     At any time.

10           A.     I'm not sure.

11                  (Kobsons Exhibit 14, a letter

12           from Stephen A. Seklir dated

13           February 3, 2006, to Mr. Lora Osorio,

14           was marked for identification, as of

15           this date.)

16           Q.     Ms. Eamtrakul, I am going to show

17   you what we marked as Kobsons Exhibit 14, a

18   two-page document on the letterhead of

19   Stephen A. Seklir, dated February 3rd, 2006.

20   My question to you is, have you seen that

21   letter before?

22           A.     Yes, I recognize the letter.

23           Q.     Is there anything in this letter

24   that you consider to be inaccurate?

25           A.     No, it was correct.

# EXHIBIT C

47

N. Chaudhri

1

2     I will represent to you are ECB violation

3     details obtained from the New York City Web

4     site --

5          A.     Yes, sir.

6          Q.     -- on December 3rd of 2007.

7          A.     Right.

8          Q.     I show that to you and ask you if

9     you have seen any of these before.

10         A.     Well, if you ask me six months back,

11    I don't remember page by page, but I think I

12    have looked at them.  But I don't remember the

13    content, but I know failure to maintain.  There

14    you see the violation, several.

15         Q.     If we can look at the first page of

16    Chaudhri 4, on December 3rd, 2007 was that an

17    active violation?

18              MR. BRILL:  Wait a second, hold on.

19         December 3?

20              MR. BENSON:  2007.

21         A.     I don't know December 3rd.  I looked

22    at it around March -- September and October.

23         Q.     Let me ask you, as of September 2007

24    was this an active violation?

25              MR. BRILL:  Do you know?

48

N. Chaudhri

1

2      A.    I think if this is dated December,

3    it says active, it was active on that date,

4    too.  It can not go backward.  If it was

5    resolved, it was resolved, but it doesn't

6    become -- a typical violation does not become

7    active and reactive.  It stays open, or open.

8    It was active prior to that, too.  There is no

9    shifting back and forth.

10      Q.    Does the first page of Chaudhri 4

11   reflect a violation issued originally in

12   September of 2005?

13           MR. BRILL:  You are asking him based

14       on his review of the document?

15           MR. BENSON:  Yes.

16           MR. BRILL:  Or personal knowledge?

17           MR. BENSON:  Based on his review of

18       the document.

19      A.    I don't know after that.  Whatever

20   is there is there.  I looked at the content,

21   what was the violation.  I don't know more or

22   less.  I must have looked at the date, how late,

23   or how early that violation was issued.  That

24   tells how serious the condition is.  It was

25   delivered, according to record, if I read it,

49

1                    N. Chaudhri

2    9/29/2005.  I don't remember.  I have a pretty

3    good memory.  I won't remember, and I am not

4    supposed to remember all of this.

5         Q.    At the time that you prepared your

6    September 14th, 2007 report --

7         A.    Right, yes, sir.

8         Q.    -- had you determined the building,

9    311 Tenth Avenue, had prior violations for

10   failure to maintain?

11        A.    Yeah, I looked at them, yes.  But as

12   a professional I had to look and make my own

13   opinion.  So the violations were there, fine,

14   and they substantiate, yes, that the problem was

15   long-lasting, but as a professional I had to

16   make my own views.  That's why I inspected.

17   Otherwise, I would ask them to look at the

18   violations.

19        Q.    Following your issuance of the

20   September 14th report did there come a time when

21   you returned to 311 Tenth Avenue?

22        A.    Yeah, I have been after.  I think I

23   inspected in October, October 14th -- 15th I

24   think, 15th.

25        Q.    Why did you inspect on that day?

56

N. Chaudhri

1

2      A.    I don't see -- first of all, I do

3   not understand the question properly.

4      Q.    All right.

5      A.    But I think it's the violation for

6   interior defects, as for shoring, and the same

7   is being asked here.

8      Q.    It addresses the same condition --

9      A.    Yes.

10     Q.    -- as one of the violations of

11  September?

12     A.    Yes.  Basically only one thing.  It

13  is not a difference.  It is different

14  interpretation.  Like the violation says, shore

15  first and second floor.  The same thing, provide

16  temporary shoring at the cellar and first

17  story.  It is the same thing, because one is

18  ceiling, this is ceiling.  But this is basically

19  the floor if it is floor above.  That's the only

20  difference.  But it is not a difference, just a

21  language, but it is no difference.  In a sense

22  it is the same.

23     Q.    But it is an Emergency Declaration,

24  rather than a violation?

25     A.    Yes, it is an emergency.

57

N. Chaudhri

1

2     Q.     What is the significance of that

3  difference, if any?

4           MR. BRILL:   If you know.

5     A.     Well, first of all, you have to

6  contact the Legal Department to find out the

7  exact significance.  But what I know as an

8  engineer, that that requires the owner -- the

9  language is very clear by itself, you can read

10  it -- it is asking the owner if you fail to do

11  so, it asking to commence the immediate work,

12  the city would perform the necessary work and

13  seek to recover its expenses from you.  So

14  basically saying that the owner had no choice,

15  he has to do it.  That's the difference.

16  Because violation, the owner can fight in the

17  court, and try to fight in the court.  But here

18  he is left no choice, I believe.  But again --

19     Q.     With respect to the Emergency

20  Declaration, if the work is not carried out --

21     A.     Right.

22     Q.     -- the city can carry it out instead

23  of the owner?

24     A.     Will bill.  Yes, a lien is put

25  against the owner and we get it done through

**EXHIBIT D**


**UnitedAmerica** Insurance Group

Penn-America Group, Inc.®
Penn-America Insurance Company®
Penn-Star Insurance Company®
Penn-Patriot Insurance Company

United National Group®
United National Insurance Company®
Diamond State Insurance Company®
United National Specialty Insurance Company®
United National Casualty Insurance Company®

## *CERTIFICATION*

This is a true and certified copy of policy number M5200158.

Name: _Priscilla K. Priestman_
        Priscilla K. Priestman

Title:  Assistant Vice President

Date: _12-4-07_

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
JEANINE WOEHR, Notary Public
Lower Merion Twp., Montgomery County
My Commission Expires March 29, 2011

Sworn to and subscribed before me
this _4th_ day of _December_ 20 _07_.

_Jeanine Woehr_

Three Bala Plaza East • Suite 300 • Bala Cynwyd, PA 19004 • P: 610.664.1500 • F: 610.660.8882
*A member of UnitedAmerica Indemnity, Ltd.*



united
national
group

# UNITED NATIONAL SPECIALTY INSURANCE COMPANY
*A Stock Company*
MILWAUKEE, WISCONSIN

## COMMERCIAL INSURANCE POLICY
## COMMON POLICY DECLARATIONS

**Policy Number:**   M5200158                    **Renewal of:**  M5156187

**Named Insured:**   C.D. KOBSON INC.

**Mailing Address:**   C/O DIANA EAMTRAKUL
Street:   212 WEST 122ND STREET.
APT.1
City:   NEW YORK
State & Zip Code:   NY  10027

**Producer Name:**   Morstan General Agency Inc.
Address:   600 COMMUNITY DRIVE
PO BOX 4500

MANHASSET        NY 11030
**Producer Number:**   01194

**Policy Period:**   From: June 15, 2007      To:  June 15, 2008
at 12:01 A.M. Standard Time at the mailing address shown above.

**Business Description:**   BUILDING OWNER

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE
AGREE WITH YOU TO PROVIDE THE INSURANCE, AS STATED IN THIS POLICY.

| THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT. | PREMIUM |
|---|---|
| Commercial Property Coverage Part | $3,199.00 |
| Commercial General Liability Coverage Part | $1,839.00 |
| NY FIRE FEE | $30.20 |
| | |
| **TOTAL** | $5,068.20 |

Premium shown is payable:   $5,068   at inception;        1st Anniversary;        2nd Anniversary

Form(s) and Endorsement(s) made a part of this policy at time of issue:

SEE ATTACHED SCHEDULE OF POLICY FORMS AND ENDORSEMENTS SAA-100

By: _____
Countersigned

05/25/07                          COMPANY
DPA-100 (8-98)

C.D. KOBSON INC.                                                          M5200158

## SCHEDULE OF POLICY FORMS AND ENDORSEMENTS

Form(s) and Endorsement(s) made a part of this policy at time of issue.

| Form Number | Edition Date | Description |
|---|---|---|

COMMON

| | | |
|---|---|---|
| DPA100 | 0898 | COMMON POLICY DECLARATIONS |
| IL0017 | 1198 | COMMON POLICY CONDITIONS |
| IL0021 | 1185 | NUCLE ENERGY LIAB EXCL (BROAD) |
| IL0183 | 0498 | NY CHANGES - FRAUD |
| IL0185 | 0498 | NY CHANGES - CALC OF PREM |
| IL0268 | 0498 | NY CHANGES - CANC & NON RENL |
| IL0935 | 0898 | EXCL - COMPUTER RELATED LOSSES |
| IL0968 | 1102 | EXCL CERT ACTS OF TERRORISM / FIRE |
| IL0985 | 0103 | DISCLOSURE TERROR RISK INSURANCE |

COMMERCIAL GENERAL LIABILITY

| | | |
|---|---|---|
| CL150 | 0995 | CGL COVERAGE PART DECLARATIONS |
| CG0001 | 0196 | CGL COVERAGE FORM |
| CG0062 | 1202 | WAR LIABILITY EXCLUSION |
| CG0163 | 0798 | NY CHANGES - CGL COVERAGE FORM |
| CG2144 | 1185 | LIMIT OF COV DES PREM PROJECT |
| CG2147 | 1093 | EMPLYMNT RELATED PRACTICE EXCL |
| CG2149 | 0196 | TOTAL POLLUTION EXCL ENDT |
| CG2160 | 0998 | EXCL YEAR 2000 |
| CG2173 | 1202 | EXCL OF CERTIFIED ACTS OF TERRORISM |
| CG2621 | 1091 | NY CHANGES/TRANSFER OF DUTIES |
| SL11 | 0598 | EXCL - ASBESTOS |
| SL31 | 0298 | EXCL - LEAD LIABILITY |
| SL66 | 0698 | AMENDMENT OCCURRENCE |
| ** | | END OF GL FORMS |

COMMERCIAL PROPERTY

| | | |
|---|---|---|
| CF150 | 1185 | COMM'L PROPERTY COV PART DEC |
| CP0010 | 0695 | BLDG & PERSONAL PROP COV FORM |
| CP0030 | 0695 | BUS INC & EXTRA EXP COV |
| CP0090 | 0788 | COMMERCIAL PROPERTY CONDITIONS |
| CP0133 | 0497 | NY CHANGES |
| CP1010 | 0695 | CAUSES OF LOSS - BASIC FORM |
| EIA114 | 1299 | EQUIPMENT BREAKDOWN ENDT |
| SIA100 | 1299 | EQUIP BREAKDOWN SCHED ENDT |

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Copyright, Insurance Services Office, Inc., 1998

INTERLINE
IL 02 68 04 98

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NEW YORK CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL CRIME COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

A. Paragraphs **1.**, **2.**, **3.** and **5.** of the CANCELLA-TION Common Policy Condition are replaced by the following:

1. The first Named Insured shown in the Declarations may cancel this entire policy by mailing or delivering to us advance written notice of cancellation.

2. **CANCELLATION OF POLICIES IN EFFECT:**

   **a. 60 DAYS OR LESS**

   We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   (1) 30 days before the effective date of cancellation if we cancel for any reason not included in paragraph **A.2.a.(2)** below.

   (2) 15 days before the effective date of cancellation if we cancel for any of the following reasons:

      (a) Nonpayment of premium;

      (b) Conviction of a crime arising out of acts increasing the hazard insured against;

      (c) Discovery of fraud or material misrepresentation in the obtaining of the policy or in the presentation of a claim;

      (d) After issuance of the policy or after the last renewal date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and that occurred subsequent to inception of the current policy period;

   (e) Material physical change in the property insured, occurring after issuance or last annual renewal anniversary date of the policy, that results in the property becoming uninsurable in accordance with our objective, uniformly applied underwriting standards in effect at the time the policy was issued or last renewed; or material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the policy, that causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the policy was issued or last renewed;

   (f) Required pursuant to a determination by the Superintendent that continuation of our present premium volume would jeopardize our solvency or be hazardous to the interest of our policyholders, our creditors or the public;

   (g) A determination by the Superintendent that the continuation of the policy would violate, or would place us in violation of, any provision of the Insurance Code; or

(h) Where we have reason to believe, in good faith and with sufficient cause, that there is a probable risk of danger that the insured will destroy, or permit to be destroyed, the insured property for the purpose of collecting the insurance proceeds. If we cancel for this reason, you may make a written request to the Insurance Department, within 10 days of receipt of this notice, to review our cancellation decision. Also, we will simultaneously send a copy of this cancellation notice to the Insurance Department.

b. **FOR MORE THAN 60 DAYS**

If this policy has been in effect for more than 60 days, or if this policy is a renewal or continuation of a policy we issued, we may cancel only for any of the reasons listed in paragraph A.2.a.(2) above, provided we mail the first Named Insured written notice at least 15 days before the effective date of cancellation.

3. We will mail or deliver our notice, including the reason for cancellation, to the first Named Insured at the address shown in the policy and to the authorized agent or broker.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata.

However, when the premium is advanced under a premium finance agreement, the cancellation refund will be pro rata. Under such financed policies, we will be entitled to retain a minimum earned premium of 10% of the total policy premium or $60, whichever is greater. The cancellation will be effective even if we have not made or offered a refund.

B. The following is added to the CANCELLATION Common Policy Condition:

7. If one of the reasons for cancellation in paragraphs A.2.a.(2) or D.2.b.(2) exists, we may cancel this entire policy, even if the reason for cancellation pertains only to a new coverage or endorsement initially effective subsequent to the original issuance of this policy.

C. The following Conditions are added:

1. **NONRENEWAL**

If we decide not to renew this policy we will send notice as provided in paragraph **C.3.** below.

2. **CONDITIONAL RENEWAL**

If we conditionally renew this policy subject to a:

a. Change of limits;

b. Change in type of coverage;

c. Reduction of coverage;

d. Increased deductible;

e. Addition of exclusion; or

f. Increased premiums in excess of 10%, exclusive of any premium increase due to and commensurate with insured value added or increased exposure units; or as a result of experience rating, loss rating, retrospective rating or audit;

we will send notice as provided in paragraph **C.3.** below.

3. **NOTICES OF NONRENEWAL AND CONDITIONAL RENEWAL**

a. If we decide not to renew this policy or to conditionally renew this policy as provided in paragraphs **C.1.** and **C.2.** above, we will mail or deliver written notice to the first Named Insured shown in the Declarations at least 60 but not more than 120 days before:

(1) The expiration date; or

(2) The anniversary date if this is a continuous policy.

b. Notice will be mailed or delivered to the first Named Insured at the address shown in the policy and to the authorized agent or broker. If notice is mailed, proof of mailing will be sufficient proof of notice.

c. Notice will include the specific reason(s) for nonrenewal or conditional renewal, including the amount of any premium increase for conditional renewal and description of any other changes.

d. If we violate any of the provisions of paragraphs **C.3.a.**, **b.** or **c.** above by sending the first Named Insured an incomplete or late conditional renewal notice or a late nonrenewal notice:

(1) Coverage will remain in effect at the same terms and conditions of this policy at the lower of the current rates or the prior period's rates until 60 days after such notice is mailed or delivered, unless the first Named Insured, during this 60 day period, has replaced the coverage or elects to cancel.

 Copyright, Insurance Services Office, Inc., 1997    IL 02 68 04 98    □

# COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

**EFFECTIVE DATE: June 15, 2007**
**12:01 A.M., Standard Time**

**POLICY NO.:** M5200158

| LIMITS OF INSURANCE | | |
|---|---|---|
| General Aggregate Limit (Other Than Products-Completed Operations) | $ | 2,000,000 |
| Products-Completed Operations Aggregate Limit | $ | INCLUDED |
| Personal and Advertising Injury Limit | $ | 1,000,000 |
| Each Occurence Limit | $ | 1,000,000 |
| Fire Damage Limit | $ | 50,000 ANY ONE FIRE |
| Medical Expense Limit | $ | 5,000 ANY ONE PERSON |

**RETROACTIVE DATE    (CG 00 02 ONLY)**

Coverage A of this insurance does not apply to "bodily injury" or "property damage" which occurs before the Retroactive Date, if any, shown here:

(Enter Date or "None" if no Retroactive Date applies)

**FORM OF BUSINESS**

[ ] Individual    [ ] Joint Venture    [ ] Partnership    [X] Organization (other than Partnership or Joint Venture)

**LOCATION OF PREMISES**

Location of All Premises You Own, Rent or Occupy:
Loc #
001    500 WEST 28TH STREET, NEW YORK,NY                                                                                10001

**PREMIUM**

| Loc # | Classification | Code No. | Premium Basis | Rate Pr/Co | Rate All Other | Advance Premium Pr/Co | Advance Premium All Other |
|---|---|---|---|---|---|---|---|
| 001 | APARTMENTS, TENEMENTS, BOARDING OR ROOMING HOUSES-WITHOUT ELEVATOR | 60022 | UNITS 6 | INCL** | 250.231 | INCL** | 1501 |
| 001 | BUILDINGS OR PREMISES-BANK OR OFFICE-MERCANTILE OR MANUFACTURING MAINTAINED BY THE INSURED-OTHER THAN NOT-FOR-PROFIT | 61217 | AREA 1720 | INCL** | 196.410 | INCL** | 338 |
| ** | PRODUCTS COMPLETED OPERATIONS ARE SUBJECT TO THE GENERAL AGGREGATE LIMIT** | | | | | | |

|  | | Total Advance Premium | $1,839.00 |
|---|---|---|---|

**FORMS AND ENDORSEMENTS**

SEE ATTACHED SCHEDULE OF POLICY FORMS AND ENDORSEMENTS SAA-100

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under WHO IS AN INSURED (SECTION II).

Other words and phrases that appear in quotation marks have special meaning. Refer to DEFINITIONS (SECTION V).

## SECTION I – COVERAGES

### COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

   (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

   (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

b. This insurance applies to "bodily injury" and "property damage" only if:

   (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

   (2) The "bodily injury" or "property damage" occurs during the policy period.

c. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**2. Exclusions**

This insurance does not apply to:

a. **Expected or Intended Injury**

   "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

b. **Contractual Liability**

   "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

   (1) That the insured would have in the absence of the contract or agreement; or

   (2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

      (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

### 5. Premium Audit

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

### 6. Representations

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

### 7. Separation Of Insureds

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

### 8. Transfer Of Rights Of Recovery Against Others To Us

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

### 9. When We Do Not Renew

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

### SECTION V – DEFINITIONS

1. "Advertising injury" means injury arising out of one or more of the following offenses:

a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

b. Oral or written publication of material that violates a person's right of privacy;

c. Misappropriation of advertising ideas or style of doing business; or

d. Infringement of copyright, title or slogan.

2. "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in a. above; or

c. All parts of the world if:

(1) The injury or damage arises out of:

(a) Goods or products made or sold by you in the territory described in a. above; or

# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

## A. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This Coverage Part;
2. The Covered Property;
3. Your interest in the Covered Property; or
4. A claim under this Coverage Part.

## B. CONTROL OF PROPERTY

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

## C. INSURANCE UNDER TWO OR MORE COVERAGES

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

## D. LEGAL ACTION AGAINST US

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all of the terms of this Coverage Part; and
2. The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

## E. LIBERALIZATION

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

## F. NO BENEFIT TO BAILEE

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

## G. OTHER INSURANCE

1. You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

2. If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

## H. POLICY PERIOD, COVERAGE TERRITORY

Under this Coverage Part:

1. We cover loss or damage commencing:
   a. During the policy period shown in the Declarations; and
   b. Within the coverage territory.

2. The coverage territory is:
   a. The United States of America (including its territories and possessions);
   b. Puerto Rico; and
   c. Canada.

    Copyright, ISO Commercial Risk Services, Inc., 1983, 1987

I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property or Covered Income.

2. After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

   a. Someone insured by this insurance;

   b. A business firm:

      (1) Owned or controlled by you; or

      (2) That owns or controls you; or

   c. Your tenant.

This will not restrict your insurance.

Copyright, ISO Commercial Risk Services, Inc., 1983, 1987
CP 00 90 07 88